**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

In re:

                                        CASE NO. 09-20823

UNION CITY CONTRACTORS, INC.,

                    Debtor.          DECISION & ORDER


_____


<u>**BACKGROUND**</u>

On April 2, 2009, Union City Contractors, Inc. (the "Debtor")
filed a petition initiating a Chapter 7 case, and Douglas J.
Lustig, Esq., was appointed as its Chapter 7 Trustee (the
"Trustee").  In the Initial Schedules and Statements required to be
filed by Section 521 and Rule 1007, the Debtor scheduled:  (1) a
checking account with Canandaigua National Bank ("CNB") with a
balance of $86,000.00, which the Debtor indicated:  (a) was
assigned to Westchester Fire Insurance Company ("Westchester"); and
(b) would not be released by CNB; (2) numerous unsecured claims by
subcontractors, each valued at $1.00, which the Debtor indicated
were:  (a) incurred in 2007-2008; and (b) paid by Westchester; and
(3) Westchester, as a creditor, based upon its claims:  (a) as a
surety from August 2006 through August 2008 in the amount of
$529,253.95; and (b) resulting from a March 2009 assignment by the
Debtor of bank funds in connection with a potential claim arising
from a contract with the Debtor.

A Section 341 Meeting of Creditors was held on May 12, 2009 and was continued with several adjournments.

On April 17, 2009, CNB filed a Motion for Relief From Stay (the "CNB Lift Stay Motion") with regard to the Debtor's CNB savings account, which CNB indicated had a balance of $144,827.44 as of the filing of the Debtor's petition.[1]  In support of its Motion, CNB alleged that:  (1) on July 18, 2007, the Debtor executed a Promissory Master Note with CNB (the "CNB Note") in the amount of $200,000.00; (2) the CNB Note was secured by a perfected security interest in all of the Debtor's business assets, including deposit accounts, and specifically the CNB Account, pursuant to: (a) a Security Agreement, dated July 18, 2007; and (b) a New York Uniform Commercial Code ("UCC") Financing Statement, filed on July 25, 2007 (collectively the "CNB Security Agreement"); (3) the Debtor was in default under the CNB Note and Security Agreement, having failed to make payments since February 2009; (4) as of

---

[1]     While the Debtor's Schedule B Personal Property indicated that the Debtor's sole account with CNB was a checking account in the amount of $86,000.00, the CNB Lift Stay Motion indicated that as of the filing of the Debtor's petition, the Debtor had $-7.50 on deposit in its CNB checking account and $144,827.24 in its savings account.  For purposes of this Decision & Order, the Court hereinafter refers collectively to the savings and checking accounts as the "CNB Account."  The Court further notes that the funds on deposit in the CNB Account, which are the subject of the parties competing claims, likely exceed the $144,827.24 scheduled by the Debtor, due to interest accruing on the CNB Account.

April 15, 2009, the Debtor owed CNB $59,579.30[2] on the CNB Note and

Security Agreement; and (5) CNB was entitled to relief under

Section 362(d)[3] of the stays imposed by: (a) Section 362(a)(7),[4]

_____

[2]    The Court notes that the amount owed to CNB under the CNB Note and
Security Agreement is likely greater than $59,579.30 due to recoverable accruing
interest and costs.

[3]    Section 362(d) provides that:

    (d) On request of a party in interest and after notice
    and a hearing, the court shall grant relief from the
    stay provided under subsection (a) of this section, such
    as by terminating, annulling, modifying, or conditioning
    such stay—

        (1) for cause, including the lack of adequate
        protection of an interest in property of such
        party in interest;

        (2) with respect to a stay of an act against
        property under subsection (a) of this section,
        if—

            (A) the debtor does not have an equity in
            such property; and

            (B) such property is not necessary to an
            effective reorganization[.]

11 U.S.C. § 362 (2010).


[4]    Section 362(a)(7) provides that:

    (a) Except as provided in subsection (b) of this
    section, a petition filed under section 301, 302, or 303
    of this title, or an application filed under section
    5(a)(3) of the Securities Investor Protection Act of
    1970, operates as a stay, applicable to all entities,
    of—

        (7) the setoff of any debt owing to the debtor
        that arose before the commencement of the case
        under this title against any claim against the
        debtor[.]

11 U.S.C. § 362 (2010).

**Page 3**

because it possessed a right of setoff, pursuant to this Court's

jurisprudence, Section 151 of the New York Debtor and Creditor

Law,[5] and Section 553(a);[6] and (b) Section 362(a)(1),[7] pursuant to

---

[5]      Section 151 of the New York Debtor and Creditor Law provides that:

        Every debtor shall have the right upon:-

                (f) the issuance of a warrant of attachment
                against any of the property of a creditor, to set
                off and apply against any indebtedness, whether
                matured or unmatured, of such creditor to such
                debtor, any amount owing from such debtor to such
                creditor, at or at any time after, the happening
                of any of the above mentioned events, and the
                aforesaid right of set off may be exercised by
                such debtor against such creditor or against any
                trustee in bankruptcy, debtor in possession,
                assignee for the benefit of creditors, receiver
                or execution, judgment or attachment creditor of
                such creditor, or against anyone else claiming
                through or against such creditor or such trustee
                in bankruptcy, debtor in possession, assignee for
                the benefit of creditors, receivers, or
                execution, judgment or attachment creditor,
                notwithstanding the fact that such right of set
                off shall not have been exercised by such debtor
                prior to the making, filing or issuance, or
                service upon such debtor of, or of notice of, any
                such petition; assignment for the benefit of
                creditors; appointment or application for the
                appointment of a receiver; or issuance of
                execution, subpoena or order or warrant.

New York Debtor & Creditor Law § 151 (2010).

[6]      Section 553(a) provides that:

        (a) Except as otherwise provided in this section and in
        sections 362 and 363 of this title, this title does not
        affect any right of a creditor to offset a mutual debt
        owing by such creditor to the debtor that arose before
        the commencement of the case under this title against a
        claim of such creditor against the debtor that arose
        before the commencement of the case, except to the
        extent that—

                (1) the claim of such creditor against the debtor
                is disallowed;

                (2) such claim was transferred, by an entity
                other than the debtor, to such creditor—

CNB's rights as a perfected secured creditor with a right to enforce the CNB Security Agreement, under UCC §§9-104(a)(1),[8] 9-607(a)(4),[9] 9-327(3)[10] and 9-340.[11]

--------------------------------------------------

> (A) after the commencement of the case; or
>
> (B)
>
>> (i) after 90 days before the date of the filing of the petition; and
>>
>> (ii) while the debtor was insolvent (except for a setoff of a kind described in section 362 (b)(6), 362 (b)(7), 362 (b)(17), 362 (b)(27), 555, 556, 559, 560, or 561)[.]

11 U.S.C. § 553 (2010).

[7]    Section 362(a)(1) provides that:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
>> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362(a)(1).

[8]    § 9-104. CONTROL OF DEPOSIT ACCOUNT

> (a) Requirements for control.
>
>> A secured party has control of a deposit account if:
>>
>>> (1) the secured party is the bank with which the deposit account is maintained[.]

Uniform Commercial Code § 9-104 (2010).

[9]    § 9-607. COLLECTION AND ENFORCEMENT BY SECURED PARTY.

> (a) Collection and enforcement generally.

The Court set a hearing on the CNB Lift Stay Motion for May 6, 2009, which was adjourned upon the consent of the parties, and, at

---

> If so agreed, and in any event after default, a secured party:
>
>> (4) if it holds a security interest in a deposit account perfected by control under Section 9104(a)(1), may apply the balance of the deposit account to the obligation secured by the deposit account[.]

Uniform Commercial Code § 9-607 (2010).

[10]     § 9-327. PRIORITY OF SECURITY INTERESTS IN DEPOSIT ACCOUNT.

> The following rules govern priority among conflicting security interests in the same deposit account:
>
>> (3) Except as otherwise provided in paragraph (4), a security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party.

Uniform Commercial Code § 9-327 (2010).

[11]     § 9-340. EFFECTIVENESS OF RIGHT OF RECOUPMENT OR SET-OFF AGAINST DEPOSIT ACCOUNT.

> (a) Exercise of recoupment or set-off.
>
>> Except as otherwise provided in subsection (c), a bank with which a deposit account is maintained may exercise any right of recoupment or set-off against a secured party that holds a security interest in the deposit account.
>
> (b) Recoupment or setoff not affected by security interest.
>
>> Except as otherwise provided in subsection (c), the application of this article to a security interest in a deposit account does not affect a right of recoupment or set-off of the secured party as to a deposit account maintained with the secured party.
>
> (c) When set-off ineffective.
>
>> The exercise by a bank of a set-off against a deposit account is ineffective against a secured party that holds a security interest in the deposit account which is perfected by control under Section 9-104(a)(3), if the set-off is based on a claim against the debtor.

Uniform Commercial Code § 9-340 (2010).

the request of the parties, the Court set a hearing for July 22, 2009 on the CNB Lift Stay Motion and any cross-motions subsequently filed.

On July 9, 2009, CNB filed an Affidavit of Steven Swartout, Esq. (the "Swartout Affidavit"), CNB's General Counsel and Executive Vice President for Corporate Risk, which stated that the balance on deposit in the CNB Account was the result of one June 12, 2008 electronic deposit made by the United States Treasury in the amount of $167,268.63 (the "Progress Payment").[12]  The Swartout Affidavit included an Affidavit of the Debtor's President, Duane Cuyler, dated March 2009, which had been prepared for Westchester, and which stated that:  (1) the Debtor had entered into two contracts with the  U. S. Department of Veterans Affairs (the "VA"), dated September 15, 2006, for the renovation of the VA's Samuel S. Stratton Medical Center in Albany, New York (the "Stratton Project"); one contract in the amount of $1,253,571.00 for the C-Wing (the "C-Wing"), and a second contract in the amount of $946,399.00 for the D-Wing (the "D-Wing")(collectively, the "Stratton Project Contracts"); (2) the VA had made a partial payment to the Debtor but held a balance, including retainage, in the amount of $419,888.21 (the "Contract Balance"), which consisted of $214,073.74 for the C-Wing and $205,814.47 for the D-Wing; (3)

---

[12]     In view of the current balance in the CNB Account, it is clear that the Debtor utilized some of the Progress Payment.

the Debtor was indebted to its subcontractors and suppliers for labor and materials on the Stratton Project in the amount of $295,822.62 for the C-Wing and $241,359.72 for the D-Wing, with some of these claims in dispute; (4) Westchester, as surety on the Stratton Project, had a security interest in the Contract Balance, pursuant to the provisions of a June 21, 2005 General Indemnity Agreement (the "Westchester Indemnity Agreement"); (5) Westchester sought to recover the Contract Balance in order to pay the Debtor's still unpaid subcontractors and suppliers, or to reimburse Westchester, which had paid eleven unpaid vendors on the Stratton Project; (6) Westchester also sought the balance on deposit in the CNB Account, which Cuyler stated were funds: (a) traceable solely to the Stratton Project; (b) on deposit in an account specifically set up to handle funds generated from the Stratton Project; and (c) that must first be used to pay laborers and materialmen on the Stratton Project or their respective assignees and subrogees, specifically Westchester; and (7) because the Stratton Project was a job for the Federal Government, it was subject to The Miller Act, which supercedes Article 3-A of the New York Lien Law.

On July 20, 2009, Colonial Surety Company ("Colonial") filed an Affidavit in Response to the CNB Lift Stay Motion, in which Colonial conceded that CNB was entitled to exercise its right of setoff against the CNB Account, but it also claimed that it had a

right to any remaining balance in the CNB Account, as well as the Contract Balance, to the extent necessary to compensate Colonial, which was also a surety of the Debtor. Colonial asserted that its rights were based upon: (1) its July 2007 payment and performance bonds issued to Debtor as principal for six contracts unrelated to the Stratton Project (the "Colonial Bonded Contracts"); (2) a General Indemnity Agreement, dated July 25, 2007 (the "Colonial Indemnity Agreement") which provided: (a) that the Debtor agreed to indemnify Colonial for any bonds, including the July 2007 payment and performance bonds; (b) for the assignment of the Debtor's accounts receivable, including all sums due or which might become due under the Colonial Bonded Contracts, and all of the Debtor's other contracts, bonded or unbonded; and (c) that all monies due or to become due to the Debtor under the Colonial Bonded Contracts were trust funds, whether in the possession of the Debtor or otherwise, for the benefit and payment of the Debtor's laborers and materialmen for work performed on the Colonial Bonded Contracts; (3) Colonial's August 3, 2007 filing of a UCC Financing Statement, which resulted in a perfected security interest in all of the Debtor's contracts and accounts receivable; (4) a New York State Supreme Court Decision, dated January 14, 2009 (the "Colonial Decision"), which upheld the Colonial General Indemnity Agreement and Colonial's security interest and assignment of rights, and

restrained the Debtor's subcontractors, that had obtained a judgment[13] against the Debtor for its non-payment of work on the Colonial Bonded Contracts, from encumbering the Debtor's assets without Colonial's express consent; and (5) Colonial's rights as a perfected secured creditor under the Colonial Indemnity Agreement, which were superior to the rights of Westchester, that had failed to perfect its own security interest as granted to it by the Westchester Indemnity Agreement. Colonial also asserted that Westchester: (1) did not have superior rights to Colonial, pursuant to the Debtor's assignments of the Stratton Project contract proceeds, including contract balances and retainages, dated February 9, 2009 and February 11, 2009 (the "Westchester Assignments"), because those Assignments were derived from the unperfected Westchester security interest, and the execution and perfection of the Assignments violated the Colonial Decision; and (2) Colonial had superior rights to Westchester because of the Debtor's diversion of $1,139,998.00 in net income from the Colonial Bonded Contracts to complete the Stratton Project, which formed the basis of claims by Colonial against Westchester for subrogation and unjust enrichment.

---

[13]    The Debtor's default under several of the Colonial Bonded Contracts, resulted in payment bond claims by subcontractors (the "Colonial State Court Action") that formed the basis of a New York State Supreme Court Judgment, dated May 29, 2008, against the Debtor for $288,242.54.

On July 31, 2009, Westchester filed a Cross-Motion for Relief From the Stay (the "Westchester Lift Stay Motion"), which requested that the Court direct the VA to pay the Contract Balance to Westchester, or alternately, to declare that the Contract Balance was not property of the estate and to authorize Westchester to deliver the Westchester Assignments to the VA. The Westchester Lift Stay Motion stated that: (1) the Debtor was sent notices to proceed on the D-Wing and C-Wing on October 4, 2006 and November 6, 2006, respectively; (2) on August 9, 2007, the Debtor was sent a Notice to Show Cause why the Debtor's contracts should not be terminated; (3) due to the Debtor's failure to pay subcontractors and suppliers, payment bond claims of over $1,000,000.00 were filed against Westchester; (4) some of the payment bond claims were disputed, however, Westchester had paid a total of $536,586.79 to laborers and materialmen, as evidenced by checks dated March 5, 2009 and April 3, 2009;[14] (5) the Contract Balance was not property

---

[14] Westchester attached to the Westchester Lift Stay Motion: (1) checks from Westchester to the Debtor's subcontractors, dated March 5, 2009 and April 3, 2009, evidencing the entirety of its payment bond claims on the Stratton Project; and (2) Release, Assignment and Lien Waiver's from the subcontractors it paid, dated February and March 2009, which: (a) released Westchester from liability to the subcontractor for any claims arising from the Stratton Project; (b) assigned the subcontractor's rights arising from the subcontractor's performance on the Stratton Project to Westchester; (c) subrogated Westchester to the subcontractor's rights arising from the subcontractor's performance on the Stratton Project; and (d) waived any liens or right to a lien arising from the subcontractor's work on the Stratton Project.

Additionally, Westchester alleged that it paid approximately $115,510.68 in expenses, including $88,014.57 in engineering expenses, for which Westchester did not seek reimbursement.

of the Debtor's estate because: (a) pursuant to <u>Pearlman v.</u>
<u>Reliance Ins. Co.</u>, 371 U.S. 132 (1962)("<u>Pearlman</u>"), a surety that
paid laborers and materialmen was entitled to the benefit of the
all the rights necessary to reimburse it, including rights to
contract retainage, so that Westchester, having paid laborers and
materialmen on the Stratton Project, was entitled to the Contract
Balance; (b) under <u>Universal Bonding Ins. Co. v. Gittens and</u>
<u>Sprinkle Enterprises, Inc.</u>, 960 F.2d 306 (3rd Cir. 1992)("<u>Universal</u>
<u>Bonding</u>"), a surety's rights under <u>Pearlman</u> were extended to funds
earned and already paid to the contractor; and (c) while
subcontractors had no right to pursue the government to collect
federal contract funds under <u>U.S. v. Munsey Trust Co.</u>, 332 U.S. 234
(1947)("<u>Munsey</u>"), pursuant to <u>United States Fidelity & Guaranty Co.</u>
<u>v. U.S.</u>, 475 F.2d 1377, 227 Ct. Cl. 236 (1981)("<u>U.S.F&G</u>"), once a
surety paid a debtor's subcontractors, it became subrogated not
only to the equitable rights of the subcontractors, but also to the
contract rights of the debtor, who was in privity with the
government and whose rights were not barred by sovereign immunity;
(6) Westchester's rights to the Contract Balance were superior to
other creditors because: (a) a surety on a payment or performance
bond had a right to equitable subrogation, which related back to
the date of the surety's issuance of the bonds for the contract,
and which took precedence over any subsequently acquired interest

in any payment due to the principal; (b) a surety's subrogation rights arose by operation of law, thus they did not require recording, per <u>National Shawmut Bank of Boston v. New Amsterdam Cas. Co.</u>, 411 F.2d 843 (1st Cir. 1969)("<u>National Shawmut Bank</u>"); and (c) numerous courts, including <u>Pearlman</u>, <u>U.S.F&G</u>, <u>National Shawmut Bank</u>, and <u>Q.C. Piping Installations, Inc. v. Dormitory Authority of the State of N.Y.</u>, 225 B.R. 553 (Bankr. E.D.N.Y. 1998)("<u>Q.C. Piping Installations</u>"), have held that the subrogation rights of a surety that paid laborers and materialmen under a Miller Act contract had priority to retained funds over an assignee of the prime contractor, which could not have rights greater than the prime contractor, therefore, Westchester's subrogation rights were superior to the secured rights of CNB and Colonial; and (7) Westchester's rights to the Contract Balance were also superior to Colonial's rights because: (a) Westchester could not have been unjustly enriched by rightly standing in the shoes of the Stratton Project laborers and materialmen that it paid, while Colonial did not contract to do work on the Stratton Project; (b) Westchester was not a party to the action that resulted in the Colonial Decision, nor did the Decision refer to Westchester; (c) the Colonial Decision did not indicate that Colonial was entitled to the funds on deposit in the CNB Account, but rather, only that Colonial had an interest in the CNB Account, which Westchester

asserted was subordinate to Westchester's interest; (d) Colonial did not submit evidence of any losses on the Colonial Bonded Contracts; and (e) a restraint on the Debtor's use of its profits was inapposite to commercial interests.

On August 25, 2009, Colonial filed a Cross-Motion for Relief From Stay (the "Colonial Lift Stay Motion"), which stated that: (1) the Contract Balance was not property of the Debtor's estate because it was assigned to Colonial pursuant to the Colonial Indemnity Agreement, not because, as Westchester alleged, it was trust funds for unpaid subcontractors, since even the Westchester Lift Stay Motion established, per an attached April 6, 2009 email from the VA, that as of that date, Westchester had paid all subcontractors and vendors; (2) despite Westchester's allegations to the contrary, there remained an unpaid contract balance on the Colonial Bonded Contracts; (3) the Debtor's diversion of the $1,139,998.00 in net income (the "Colonial Profit") from Colonial Bonded Contracts was evidenced by the Debtor's testimony at a July 7, 2009 341 Meeting of Creditors, wherein it was stated that the Stratton Project would not have been completed without this money; and (4) Colonial was entitled to be subrogated to Westchester and Westchester had been unjustly enriched because without this diversion, Westchester would not have completed the

job, and accordingly, the Contract Balance would not have been available.

On August 28, 2009, the Trustee filed a Response to the CNB, Colonial and Westchester Lift Stay Motions, which stated that the Trustee did not object to CNB's right of setoff on the CNB Account, but the Trustee objected to any funds being paid over to Westchester or Colonial, and instead sought to be paid any balance in the CNB Account after the setoff, because: (1) the CNB Account was property of the estate; (2) Westchester had no perfected security interest in the CNB Account, or other rights to the CNB Account, because Westchester's purported rights in the CNB Account, through the Westchester Assignments, violated the Colonial Decision; (3) Colonial had a perfected security interest in a number of assets in addition to the CNB Account that had sufficient equity to pay Colonial's claim in full; and (4) both Westchester and Colonial had the benefit of payments from various non-bonded jobs which reduced the amount of their claims, and, based upon these payments, as well as Colonial's other collateral, both Colonial and Westchester should be required to liquidate their collateral before making any claim against the Debtor's estate.

On August 28, 2009, CNB filed a Reply Memorandum of Law in Support of the CNB Lift Stay Motion, which stated that CNB did not oppose the Westchester or Colonial Lift Stay Motions as they

applied to the Contract Balance, because CNB acknowledged that Courts, including those in _Pearlman_ and _National Shawmut Bank_, have recognized that a completing surety had a right to contract retainage, and in some instances, unpaid progress payments, which were still in the possession of the owner. However, concerning the CNB Account, CNB alleged that: (1) CNB was entitled to the CNB Account because it was comprised of the Progress Payment, which was deposited into that Account nearly one year prior to the filing of the Debtor's petition; (2) pursuant to _Q.C. Piping Installations_, a distinction existed between a dispute involving contract retainage after a debtor's pre-petition default under _Pearlman_, and a dispute that involved progress payments to a performing debtor-contractor, under _American States Ins. Co. v. Glover Constr. Co. Inc._ 30 B.R. 873 (Bankr. W.D. Ky. 1983)("_Glover_"); (3) in this case, the Debtor earned the Progress Payment that was deposited into the CNB Account based upon its satisfactory performance; (4) although the VA sent a letter to the Debtor that threatened the Debtor's termination, there was no dispute that the Debtor's contracts on the Stratton Project were not terminated when the Progress Payment was made, and that the Debtor continued to perform under the Stratton Project Contracts after the Payment was made; (5) as stated in _International Fidelity Ins. Co. v. U.S._ (8th Cir. 1991)("_International Fidelity_"), when payments earned under a

**Page 16**

contract are paid to the contractor, they are freed of any equity or right of subrogation by the surety, in order to ensure the free flow of commerce and to prevent disputes about future claims to the money; (6) while Westchester likely had equitable subrogation rights in the Contract Balance, it did not have the same rights in the Progress Payment that had been deposited into the CNB Account; (7) since the Progress Payment consisted of proceeds from a federally owned property, it was not subject to a statutory trust under New York Lien Law; and (8) CNB had priority over other secured creditors:  (a) pursuant to UCC §§9-327(c) and 9-340, and Section 151 of the Debtor and Creditor Law; (b) under the CNB Security Agreement, which was perfected before the security interest granted to Colonial under the Colonial Indemnity Agreement; and (c) because the security interest granted to Westchester under the Westchester Indemnity Agreement was never perfected, and the Westchester Assignments were executed after the Progress Payment was made.

On August 28, 2009, Westchester filed an Affidavit in Opposition to the Colonial Lift Stay Motion, which reiterated the assertions made in the Westchester Lift Stay Motion, and further alleged that: (1) under Universal Bonding, Westchester had superior rights to the funds already paid to the Debtor from the Stratton Project, and deposited into the CNB Account, because upon deposit,

the funds became trust funds for the benefit of the Stratton Project laborers and materialmen, and Westchester was subrogated to those rights; (2) the Colonial Decision specifically stated that: (a) the Court made no determination as to the amount or priority of the lien or security interests of any creditors or sureties of the Debtor that were not parties to the Colonial State Court Action; and (b) the restraining notice essentially became operable only after payment of subcontractors, because Colonial could not reach assets earmarked for subcontractors, and the Court did not speculate as to the likelihood of surplus monies after obligations to subcontractors were satisfied; (3) in its submissions in the Colonial State Court Action and before this Court, Colonial had alternately alleged that all funds received and to be received by the Debtor were trust funds; (4) Colonial's interest, if any, was as a secured creditor through the Colonial Indemnity Agreement, which did not encompass the Stratton Project, and which did not create an equitable interest, but it only provided for a secured interest in funds owed to the Debtor, and in this case, no such funds existed; (5) the Colonial Lift Stay Motion demonstrated that a net surplus existed on the Colonial Bonded Contracts; (6) Colonial conceded that it had not made any payments to laborers and materialmen on the Colonial Bonded Contracts, and, therefore, it had no subrogation rights relating to the Stratton Project; and (7)

Colonial was not a co-surety on the Stratton Project because it did not enter a co-surety agreement nor did it jointly issue a single bond with Westchester.

On August 31, 2009, Colonial filed a Reply Affidavit which further alleged that: (1) Westchester was bound by the Colonial Decision because a judgment on the merits was binding not only on the parties to the action but also to those in privity, and Westchester was in privity with the Debtor by virtue of the Westchester Indemnity Agreement and related bonds; (2) the Colonial Decision upheld the Colonial Indemnity Agreement, under which any diversion of contract funds from one contractor to another, prior to Colonial's discharge on its bond, was a default; (3) the Colonial Profit paid to the Debtor on the Colonial Bonded Contracts had been assigned by the Debtor to Colonial under the Colonial Indemnity Agreement; (4) the Colonial Profit was used to complete the Stratton Project, and Westchester's payments to laborers and materialmen were not made until several months after the completion and acceptance of the Stratton Project, and therefore the payments supported Colonial's claim for equitable subrogation; (5) Westchester had not disputed that once all laborers and materialmen were paid, the contract funds were no longer trust funds, and here, all laborers and materialmen had been paid on the Stratton Project; (6) Colonial had only asserted that the Colonial Profit diverted

from the Colonial Bonded Contracts was subject to the trust created by the Colonial Indemnity Agreement, such that monies diverted from the Colonial Bonded Contracts were trust funds to the extent that unpaid claims existed on that Contract; and (7) unjust enrichment existed not only where a party received money or property, but also where it received a benefit, notwithstanding any showing of wrongdoing.

On September 2, 2009, at a hearing on the CNB, Colonial and Westchester Lift Stay Motions: (1) the parties agreed that because the Progress Payment consisted of proceeds from a federally owned property, it was not subject to a statutory trust under Article 3-A of the New York Lien Law; (2) the Trustee and Colonial agreed that CNB had a superior right to the amounts on deposit in the CNB Account by virtue of its first perfected security interest and/or banker's lien and right of setoff on the CNB Account; (3) the Trustee agreed that the automatic stay should be lifted for Colonial and Westchester to determine their rights to the Contract Balance in an appropriate state or federal court; (4) Westchester asserted that its rights superceded the rights of CNB and Colonial in the CNB Account under Universal Bonding; (5) the Trustee agreed with the Court that it had no right to marshall the collateral being held by Colonial and/or Westchester in order to assert a claim to the balance in the CNB Account after a CNB setoff; (6)

Page 20

Colonial indicated that it had not paid any bond claims on the Colonial Bonded Contracts; and (7) the Court adjourned the CNB, Colonial and Westchester Lift Stay Motions to October 7, 2009, upon the request of the parties, including CNB's request to respond to Westchester's reliance upon Universal Bonding.

On October 1, 2009, CNB filed a Brief in Further Support of the CNB Lift Stay Motion, which alleged that Universal Bonding was inapplicable on the facts and circumstances of this case, because it concerned contract retainage that remained in the possession of the project owner, while the amounts on deposit in the CNB Account consisted of a Progress Payment, which was earned and paid by the owner nearly one year prior to the filing of the Debtor's petition. Also, CNB indicated that, in Universal Bonding, a trust was imposed under New Jersey law on the funds paid by the state to a general contractor, but, in this case, the parties had acknowledged that no statutory trust existed. Additionally, CNB stated that Westchester's allegation that Colonial was entitled to the Colonial Profit, because such payment was freed of any equitable right of subrogation in the surety in order promote the free flow of commerce, applies equally here to the Progress Payment.

On October 1, 2009, Westchester filed a Further Memorandum in Support of the Westchester Lift Stay Motion and in Opposition to the CNB and Colonial Lift Stay Motions, which alleged that: (1)

while the surety in <u>Universal Bonding</u> had not yet paid laborers and materialmen, <u>Universal Bonding</u> was controlling law for the proposition that once the project funds were paid by the federal agencies to the general contractor, the funds constituted an equitable trust for the benefit of laborers and materialmen, and that the surety may become the beneficiary of the trust by fulfilling its obligations to compensate laborers and materialmen; and (2) Westchester, as a completing surety, had prior and superior rights to retainage and progress payments, which were superior to the Debtor's rights and anyone who takes through the Debtor, including secured creditors.

On October 7, 2009, a hearing was held on the CNB, Colonial and Westchester Lift Stay Motions. At the hearing, Colonial supported the CNB Lift Stay Motion, specifically alleging that: (1) CNB had a first priority to the amounts on deposit in the CNB Account, based upon its perfected secured rights under the UCC and/or its banker's lien, and, therefore, had a right of setoff; (2) CNB's rights were superior to Westchester's alleged equitable subrogation rights; and (3) Colonial was entitled to any balance in the CNB Account after the CNB setoff by reason of its perfected security interest. At Westchester's request, the Court also permitted the parties to submit additional briefs addressing whether a default by the Debtor under the Stratton Project

Contracts, at the time of the Progress Payment and the deposit into the CNB Account, affected the disposition of the CNB Account, and whether such a default could be established.

On November 6, 2009, Westchester filed a Supplemental Affidavit in Support of the Westchester Lift Stay Motion and in Opposition to the Colonial and CNB Lift Stay Motions, which alleged that: (1) at the time the Progress Payment was deposited into the CNB Account, the Debtor owed laborers and materialmen at least $333,564.23, which included: (a) $305,661.73 owed to subcontractor Crosby-Brownlie pursuant to the Affidavit of its CEO Gavin Brownlie (the "Brownlie Affidavit"); and (b) $27,902.50 owed to subcontractor Troy Management as indicated in the Affidavit of Michael Hart (the "Hart Affidavit"); (2) pursuant to the Stratton Project Contracts: (a) the Debtor was required to certify with each request for a progress payment that all payments due to laborers and materialmen had been made from previously received progress payments and would be made from the requested progress payment; and (b) the Debtor was required to pay laborers and materialmen within seven (7) days from the Debtor's receipt of progress payments; and (3) as a result of the Debtor's failure to fulfill its duty under the Contracts to pay laborers and materialmen, and as a result of the Westchester Assignments, the CNB Account was an equitable trust fund for the benefit of laborers and materialmen who were unpaid as

of the Progress Payment, and consequently for Westchester's benefit, due to: (a) Westchester's subsequent payments as a surety; and (b) its status under the Westchester Assignments.

On November 19, 2009, Colonial filed a letter wherein Colonial re-stated its support of the CNB Lift Stay Motion, namely that CNB and Colonial had superior rights to the CNB Account over Westchester.

On November 25, 2009, CNB filed a Supplemental Brief in Support of the CNB Lift Stay Motion which alleged that: (1) Universal Bonding was inapplicable because it dealt with retained contract proceeds, while the CNB Account was comprised of the Progress Payment, and Westchester had not provided any authority for the proposition that a surety's equitable subrogation rights extended to previously paid progress payments; (2) pursuant to International Fidelity, earned funds paid to a contractor are freed from any surety's equitable right of subrogation; (3) Westchester had not alleged that its equitable rights somehow extended to progress payments because the Debtor may have defaulted on its subcontractor agreements; (4) even if the Debtor made a false certification under the Stratton Project Contracts, Westchester's claim was solely for breach of contract, not the imposition of a trust on progress payments based upon the Debtor's failure to pay subcontractors; (5) in cases where courts have discussed the date

of a contractor's payment default to subcontractors, including <u>Q.C.
Piping Installations</u>:  (a) the issue was whether retainage and
progress payments still in the hands of the owner were property of
the contractor's bankruptcy estate; (b) the issue was determined in
those cases by the contractor's default in making payments to
subcontractors where the owner had declared the contractor in
default and had exercised its contractual right to withhold the
progress payment; and (c) if a debtor-contractor is not in default
under its contract, then it has the right to receive unpaid
progress payments pursuant to its rights to enforce the contract,
and the progress payment is property of the debtor-contractor's
bankruptcy estate; (6) in the case of the Debtor:  (a) the VA did
not declare the Debtor in default; and (b) the Stratton Project
Contracts provided that progress payments were made upon work
performed, which met the Contracts' quality standards, as approved
by the contracting officer, and, therefore, the Progress Payment
made to the Debtor was based upon the Debtor's acceptable
performance pursuant to the then fully enforceable Stratton Project
Contracts; and (7) Westchester had not provided sufficient evidence
that the Debtor was in default with its laborers and materialmen at
the time of the Progress Payment, because the Brownlie Affidavit,
Hart Affidavit and attached invoices indicated that the amounts
that were owed had either just become due and were paid by the

Debtor, or were later paid by Westchester in full satisfaction for a significantly lower amount.

## DISCUSSION

### A.   The Motions to Lift the Stay under Section 362(d)

Motions to Lift the Stay under Section 362(d) have been filed as follows:  (1) CNB, Colonial and Westchester moved for relief from the automatic stay under Section 362(d) in order to exercise their rights in and to the amounts on deposit in the CNB Account; and (2) Colonial and Westchester moved for relief from the automatic stay under Section 362(d) in order to exercise their rights in and to the Contract Balance.

The Court holds that the CNB, Colonial and Westchester Lift Stay Motions are granted in order for them to exercise their respective rights, as follows:

### 1.   The Contract Balance

The Trustee has conceded that the bankruptcy estate's interest in the Contract Balance is one of legal title only under Section 541(d).  As a result, it is not necessary for this Court to make a determination as to the respective rights of Colonial and Westchester in and to the Contract Balance.  Therefore, the Court grants the Colonial and Westchester Lift Stay Motions, pursuant to Section 362(d), in order to allow them to pursue their respective

**Page 26**

rights in and to the Contract Balance in any other State or Federal Court with jurisdiction.

### 2. The CNB Account

CNB, Colonial and Westchester have each filed Lift Stay Motions to exercise their respective rights to be paid the amounts on deposit in the CNB Account.

The Trustee has now acknowledged that, although the CNB Account is Section 541(a) property of the bankruptcy estate, the rights of CNB, Colonial, and Westchester in and to the funds on deposit in the CNB Account are superior to his rights.

The Court holds that: (1) the CNB Lift Stay Motion is granted in order to permit CNB to exercise its UCC perfected, secured, first priority rights in and to the amounts on deposit in the CNB Account, as well as its rights of setoff; (2) the Colonial Lift Stay Motion is granted in order to permit Colonial to exercise its UCC perfected, secured, second priority rights in and to any amounts remaining on deposit in the CNB Account once the CNB Note is paid in full; and (3) the Westchester Lift Stay Motion to pursue any rights that it may have in and to the amounts on deposit in the CNB Account is denied, because the amounts due to CNB and Colonial exceed the amounts on deposit in the Account.

### (a) Section 541 Property of the Estate

Section 541(a)(1) property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. However, under Section 541(d), "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest... becomes property of the estate under subsection (a)(1) or (2)...only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

While the amounts on deposit in the CNB Account would not be property of the estate if they were trust funds, the parties have agreed that these funds were not subject to a statutory trust under Article 3-A of the New York Lien Law or any other State or Federal statute.

The Court must then address whether the amounts on deposit in the CNB Account are subject to any other non-statutory trust or equitable interest, including an equitable right of subrogation, that would leave the estate with only bare legal title.

### (1) Westchester is not entitled to the amounts on deposit in the CNB Account by virtue of an equitable right of subrogation

Without making any determination as to the respective rights of the parties to the Contract Balance, the Court adopts the

following reasoning with regard to Miller Act contract retainages: (1) under <u>Prairie State National Bank v. United States</u> 164 U.S. 227 (1896), a performance bond surety, and under <u>Henningsen v. United States Fidelity & Guar. Co.</u> 208 U.S. 404 (1908)("<u>Henningsen</u>"), a payment bond surety, that completes or makes payments, is equitably subrogated to the rights of the defaulting contractor to retained contract funds; (2) pursuant to <u>Pearlman</u>,[15] these holdings are applicable to a Miller Act payment bond surety; and (3) under <u>Q.C. Piping Installations</u>: (a) a surety that, upon the debtor's pre-petition default, completes work and pays laborers and materialmen under its payment and performance bonds, acquires equitable subrogation rights, including rights in contract retainage; and (b) the contract retainage does not become property of the Debtor's estate under Section 541, because the debtor's interest in the contract retainage, after its pre-petition default, is at most bare legal title, while the surety possesses an equitable right of subrogation to the retainage.

Westchester alleges that these rights extend to the Progress Payment that is on deposit in the CNB Account.

---

[15] The Supreme Court held in <u>Pearlman</u>: "that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it[.]"

This Court holds that Westchester is not entitled to the amounts on deposit in the CNB Account, which are less than the amounts owed to CNB and Colonial, based upon an equitable right of subrogation under <u>Pearlman</u> and <u>Q.C. Piping Installations</u>, for the following reasons: (1) unlike in <u>Pearlman</u> or <u>Q.C. Piping Installations</u>, where the defaulting contractor was terminated and the owner withheld contract retainage, or in the cases cited in <u>Q.C. Piping Installations</u>, where the owners, at a minimum, withheld contract balances that included progress payments, upon the contractor's default, in this case, the amount on deposit in the CNB Account is not a retainage or progress payment that had been withheld by the VA, but is a progress payment that was: (a) not withheld by the VA; (b) earned by the Debtor when it was not in default under the Stratton Project Contracts with the VA;[16] and (c)

---

[16] While the VA letter, dated August 9, 2007, stated that the Debtor had failed to complete work on the Stratton Project by the scheduled March 6, 2007 completion date, it further stated only that the VA was considering termination of the contract. Also, it is apparent from the parties representations to the Court, including that the Debtor received the Progress Payment ten months after the VA letter, that the Debtor was not declared to be in default and/or terminated at the time of the VA letter. Additionally, notwithstanding the Brownlie Affidavit and Hart Affidavit alleging that the Debtor was in default in payment to laborers and materialmen as of the payment of the Progress Payment, the VA paid the Progress Payment to the Debtor rather than withholding it and declaring the Debtor in default. Also, the checks attached to the Westchester Lift Stay Motion do not evidence payment by Westchester to unpaid laborers and materialmen by virtue of its payment bond until March 5, 2009, approximately nine months after the VA's payment of the Progress Payment. In addition, as CNB stated, the payments to Crosby-Brownlie and Troy Management, which were the subject of the Brownlie and Hart Affidavits, had either just come due and were paid by the Debtor, or were later paid by Westchester on March 5, 2009 or April 3, 2009, in full satisfaction of the debts, for a significantly lower amount. Further, Westchester has not alleged that the VA improperly made the Progress Payment, because Westchester had incurred claims on its bonds at that time, or because the Debtor was in default at that time, or otherwise.

paid to the Debtor by the VA on June 12, 2008: (i) approximately ten months before the filing of the Debtor's bankruptcy petition; and (ii) nearly nine months before Westchester made any payments to laborers and materialmen; (2) the Court agrees with the Eighth Circuit Court of Appeals in International Fidelity that, sums fully earned and paid-out are free of any superior equitable interest or right of subrogation in a surety, in order to promote the free flow of commerce, and in order to insure that parties that receive such progress payment funds from a contractor do not have to be concerned with potential future claims for the return of the money;[17] (3) this Court believes that a careful reading of Universal Bonding results in a conclusion that any trust imposed on non-retained funds was because of the New Jersey Lien Law, not an extension of Federal decisional law; and (4) in the absence of a state or federal statutory trust, and when Federal decisional law only specifically applies to retained funds, not to fully earned and paid-out progress payments under a Miller Act contract, commercial creditors should have the ability to collateralize those paid-out progress payments, and this Court does not believe that it is appropriate or necessary to extend the Federal decisional law to such progress payments when that decisional law specifically applies only to retained funds.

---

[17] As set forth in Footnote #12, the Debtor had previously disbursed some of the Progress Payment that had been deposited into the CNB Account.

### (2) <u>The CNB Account is not otherwise a trust</u>

The Court holds that a trust is not otherwise created in the amounts on deposit in the CNB Account for the following reasons: (1) the Court agrees with the parties that Article 3-A of the New York Lien Law does not apply to the funds on deposit in the CNB Account because the Stratton Project is subject to The Miller Act; (2) the Court is not required to follow <u>Universal Bonding</u> which: (a) is not binding precedent in the Second Circuit; and (b) specifically was addressed to retained contract funds, rather than fully earned and paid progress payments made pursuant to an enforceable contract for work performed under the contract, which, as stated in this Decision & Order, are free of any superior equitable interest or right of subrogation; (3) the Stratton Project Contracts did not establish a contractual trust on the Progress Payment that was paid-out and deposited into the CNB Account; and (4) the Debtor's failures under the Stratton Project Contracts, including a failure to pay promptly laborers and materialmen, did not, as alleged by Westchester, form the basis for the imposition of a constructive trust, even though it may have been a basis: (a) for the VA, if it so elected, to declare the Debtor in default and withhold contract funds, which it did not so elect; and (b) for Westchester to request that the VA declare the Debtor in default and withhold funds based upon Westchester's

payment of laborers and materialmen or obligation to pay unpaid
laborers and materialmen, or otherwise, which it likely did not do
because Westchester did not pay any laborers and materialmen until
March 5, 2009, nearly nine months after the Progress Payment was
paid-out.

### (3)  CNB and Colonial have superior, perfected, secured claims to the CNB Account over Westchester

Based upon the foregoing, the Court holds that the amounts on
deposit in the CNB Account are not subject to a statutory or
constructive trust, nor are they subject to an equitable right of
subrogation that is superior to the rights of perfected secured
creditors in those amounts, so they are property of the Debtor's
bankruptcy estate under Section 541(a).

The Court further holds that CNB has a first priority in the
amounts on deposit in the CNB Account and Colonial is entitled to
the remaining balance in the Account, for the following reasons:
(1) the security interest in accounts receivable granted to
Westchester in the Westchester Indemnity Agreement was not
perfected as against CNB and Colonial, because it was not recorded;
(2) Westchester's reliance upon National Shawmut Bank for the
proposition that it is not required to record the Westchester
Indemnity Agreement is misplaced because National Shawmut Bank
concerned earned, but retained progress payments at the time of the
debtor's termination under its contract; (3) as a result of the CNB

BK. 09-20823

Security Agreement, with a proper UCC financing statement filed on July 25, 2007, CNB has a first, perfected security interest in the proceeds on deposit in the CNB Account, and it has further superior rights under the UCC and New York State law affording it a right of setoff; (4) Colonial has a second, perfected security interest, based upon the security interest granted to Colonial in the Colonial Indemnity Agreement, and its UCC financing statement filed on August 3, 2007; and (5) the Court makes no determination as to the validity of the Westchester Assignments as a lien on the proceeds in the CNB Account, under the Colonial Decision, or otherwise, because they were not executed until February 9, 2009, following the filings by CNB and Colonial of their respective financing statements, and the funds on deposit in the Account are less than the amounts owed to CNB and Colonial as superior, perfected secured creditors.

<u>**CONCLUSION**</u>

The Westchester and Colonial Lift Stay Motions are granted under Section 362(d) to allow them to pursue the Contract Balance, with the Court making no determination as to the proper distribution of the Contract Balance.

The CNB and Colonial Lift Stay Motions are granted for: (1) CNB to exercise its rights in the amounts on deposit in the CNB

Account, based upon its perfected first security interest and rights of setoff; and (2) Colonial to exercise its rights to the remaining amounts on deposit in the CNB Account after the CNB Note is paid in full, based upon its perfected second security interest.

The Westchester Lift Stay Motion to pursue any rights that it may have in the CNB Account is denied.


**IT IS SO ORDERED.**




_____/s/_____
**HON. JOHN C. NINFO, II**
**U.S. BANKRUPTCY JUDGE**


**Dated: March 31, 2010**